IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
BEAUMONT DIVISION

| | | |
|---|---|---|
| CH OFFSHORE, LTD, | § | |
| *Petitioner,* | § | |
| | § | |
| | § | C.A. NO. 1:23-cv-445 |
| v. | § | |
| | § | |
| Mexiship Ocean CCC S.A. de C.V., | § | |
| *Respondent.* | § | |

**PETITION TO RECOGNIZE, CONFIRM, AND ENFORCE**
**INTERNATIONAL ARBITRATION AND FOREIGN COURT AWARDS**

NOW COMES, Petitioner, CH Offshore, Ltd. ("CHO"), and respectfully petitions the Court pursuant to the Convention on the Recognition and Enforcement of Foreign Arbitral Awards (the "New York Convention"), the Federal Arbitration Act, 9 U.S.C. §§ 201-08 (the "FAA"), and state and federal common law for an order recognizing, confirming, and enforcing the Singapore International Arbitration Centre's Final Partial Awards and High Court of the Republic of Singapore's Orders against Respondent Mexiship Ocean CCC S.A. de C.V. ("MOCC"), and for entry of judgment thereon, and in support would respectfully show the following:

**INTRODUCTION**

1.      On September 13, 2022, CHO initiated arbitration against MOCC for damages arising out of MOCC's breach of an amended BIMCO BARECON 2017 form bareboat charterparty dated May 21, 2021 (the "Charterparty"). Under the Charterparty, MOCC bareboat chartered the M LUISA (ex-TURQUOISE) (IMO 9380221) (the "Vessel") from CHO, the Vessel owner. In its December 14, 2022, Statement of Claim and Application for a Final Partial Award, CHO sought past due charter hire amounting to $2,108,333.25 plus interest and costs.

2.      On June 12, 2023, CHO filed Amendment No. 1 to its Statement of Claim and Application for a Final Partial Award. The Amended Statement of Claim sought, *inter alia*, a Final Partial Award ordering MOCC to redeliver the Vessel to CHO.

3.      The sole arbitrator issued the Final Partial Award on Claimant's Application for Urgent Mandatory Injunction Requiring Respondent to Redeliver the M Luisa (Ex Turquoise) (the "Redelivery FPA") and Final Partial Award on Claimant's Claim for Unpaid Hire of the M Luisa (Ex Turquoise) (the "Unpaid Hire FPA") (together, the "FPAs") on July 26, 2023. Specifically, the arbitrator directed MOCC to: deliver possession of the Vessel to CHO; refrain from interfering with CHO's possession of the Vessel; arrange for the Vessel to be removed from the Mexican Bareboat Registry; assist in re-registering and re-flagging the Vessel in Singapore; and pay CHO $1,685,488.44 USD for unpaid hire, interest, and costs.

4.      As fully set forth below, the FPAs are unappealable under Singapore law and are final and enforceable pursuant to the New York Convention, the FAA, and applicable common law. The grounds upon which a court may refuse to confirm such a final and enforceable award are extremely narrow and the burden of proof resting on the party objecting to the confirmation of such awards is extremely high. None of the grounds to refuse confirmation of the awards exist here. Accordingly, the Court should recognize, confirm, and enforce the FPAs.

5.      Additionally, the High Court of the Republic of Singapore entered an interim injunction ordering return of the Vessel, and CHO seeks entry of judgment to enforce same. Foreign judgments can be enforced under principles of comity.

**JURISDICTION AND VENUE**

6.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 as it presents federal questions arising under the FAA. This Court also has original subject

matter jurisdiction pursuant to 9 U.S.C. § 203 as this action arises under the New York Convention. Finally, this Court has admiralty jurisdiction over this action as it is an action to enforce arbitral and judicial awards sounding in admiralty for breach of a maritime contract. *See International Sea Food, Ltd. v. M/V Campeche*, 566 F.2d 482, 484 (5th Cir. 1978); *Vitol, S.A. v. Primerose Shipping Co.*, 708 F.3d 527, 537 (4th Cir. 2013).

7.     Federal courts look to state law in deciding whether personal jurisdiction exists. *See Daimler AG v. Bauman*, 134 S.Ct. 746, 753 (2014). Under Texas law, this Court has personal jurisdiction over defendants doing business in Texas when the exercise of such jurisdiction comports with federal-due-process requirements. *See Luciano v. SprayFoamPolymers.com, LLC*, 625 S.W.3d 1, 8 (Tex. 2021) (citing *TV Azteca v. Ruiz*, 490 S.W.3d 29, 36 (Tex. 2016)).

8.     Both Texas courts and the United States Supreme Court have upheld a finding of personal jurisdiction over a foreign entity whose executive leadership officed in and worked from the United States. *See Perkins v. Benguet Consol. Mining Co.*, 342 U.S. 437, 448 (1952) (finding general personal jurisdiction in Ohio over an entity incorporated in the Philippines where the company's "president moved to Ohio, where he kept an office, maintained the company's files, and oversaw the company's activities"); *Deloitte & Touche Netherlands Antilles & Aruba v. Ulrich*, 172 S.W.3d 255, 265 (Tex.App.—Beaumont 2005) (citing *Perkins*, 342 U.S. at 446-48)  (instructing that a foreign entity "that sets up what is, in effect, a permanent office in Texas, and uses [that] base for conducting out-of-state or global business, could reasonably anticipate a Texas court may exercise general jurisdiction over [it]").

9.     This Court has personal jurisdiction over MOCC because MOCC Partner and Chief Financial Officer Rolando Ramon manages and oversees the company from Texas and

holds himself out as MOCC's representative in Texas.[1]

10.     Pursuant to 9 U.S.C. § 204, venue is proper in any district in which the underlying dispute, save for the arbitration agreement, could have been brought. The underlying dispute, as discussed in detail below, is for breach of a charterparty by MOCC, a non-resident of the United States. Therefore, pursuant to 28 U.S.C. § 1391(b)(3), (c)(3), venue is proper in this district as MOCC is a non-resident and is subject to the Court's personal jurisdiction.

## THE PARTIES

11.     Petitioner CHO is a company incorporated under the laws of the Republic of Singapore with its registered business address at 12A Jalan Samulun, Singapore 629131. CHO is an owner-operator of offshore support vessels used in the offshore marine oil and gas industry around the world. CHO is the registered owner of the Vessel.

12.     Respondent MOCC is a company incorporated under the laws of Mexico with its registered business address at Caballito de Mar No. 22, Colonia Playa Norte, C.P. 24115, Ciudad del Carmen, Campeche, Mexico. MOCC's website describes the company as "a young company dedicated to providing offshore lodging and feeding services, pioneers in the comprehensive management of drilling cuttings through innovative process vessels."[2]

13.     Respondent may be served with process through its person in charge in Texas, Rolando Ramon, because it is not required by statute to designate or maintain a registered agent in Texas for service of process.

---

[1] *See* Ex. 1 – LinkedIn page of Ronaldo Ramon; redacted emails ("I am one of the partners of Mexiship but I am based in the United States.").
[2] https://www.mexiship.com/

151518.06501/133625101v.5

## FACTUAL BACKGROUND

### I.    The Charterparty

14.    The relationship between the parties is governed by the BIMCO BARECON 2017 bareboat charterparty dated May 21, 2021 wherein CHO, as owner, agreed to charter the Vessel to MOCC, as charterer.   The Charterparty is wholly incorporated herein by reference and attached hereto as Exhibit 2.

15.    The Vessel is an offshore supply vessel built in Japan in 2008 and has a length of 68 meters and a beam of 16 meters. At commencement of the Charterparty, she was classed by the American Bureau of Shipping ("ABS") as an Anchor Handling Tug Supply Vessel. *See* Exhibit 3, ABS Class Certificate.



151518.06501/133625101v.5

16.     The Charterparty had an initial charter period of eighteen months, with the option for two six-month extensions. *See* Ex. 2 at 1, Box 16. Charter hire was $6,000 USD/day. *See* Ex. 2 at 2, Box 17. If hire was not promptly paid, CHO was entitled to terminate the Charterparty if, after providing three banking days' notice to MOCC of untimely payments, MOCC failed to pay outstanding hire. *See* Ex. 2 at 10, Cl. 15(e).

17.     All maintenance and Vessel modifications undertaken by MOCC were exclusively for MOCC's account, as were any efforts undertaken to meet class requirements during the charter period. *See* Ex. 2 at 7-9, Cl. 13.

18.     Upon expiration of the charter period, MOCC was to timely redeliver the Vessel to CHO in the same condition and class as that in which it was delivered. *See* Ex. 2 at 6-7, Cl. 10. Redelivery notice was to be provided six-months prior to the expiration of the charter term. *See* Ex. 2 at 1, Box 13. Failure to timely redeliver the Vessel constitutes a breach of the Charterparty and would result in the assessment of an enhanced hire rate, calculated as the higher of ten percent above the agreed hire rate or the then-current market price. *See* Ex. 2 at 6-7, Cl. 10. Assessment of the enhanced rate would not extend the charter's duration or otherwise prejudice CHO's ability to invoke any other remedies available to it. *See* Ex. 2 at 6-7, Cl. 10.

19.     By its terms, the Charterparty was governed by English Law and subject to arbitration in Singapore before a sole arbitrator pursuant to Singapore International Arbitration Centre ("SIAC") rules. *See* Ex. 2 at 2, Box 26; 19, Cl. 33(d).

## II.    Respondent's Breach and Tortious Conduct

20.     CHO delivered the Vessel to MOCC on June 2, 2021. *See* Exhibit 4 ¶ 103, Unpaid Hire FPA. The Vessel went on-hire on or about September 10, 2021, having been class certified by ABS the month prior. *See* Ex. 4 ¶ 104. Thus, the eighteen-month initial charter period expired

March 10, 2023. Any notice to extend the charter beyond the initial eighteen-month period was due to CHO by September 10, 2022.

21.      On or about February 7, 2023, CHO notified MOCC of its obligation to redeliver the Vessel at completion of the charter period. *See* Exhibit 5 ¶ 34, Redelivery FPA. CHO also noted that MOCC had not exercised its option to extend the initial 18-month charter period. MOCC did not respond to CHO's correspondence. *See* Ex. 5 ¶ 34.

22.      On or about March 22, 2023, counsel for CHO wrote to MOCC, placing MOCC on notice of its breach of the Charterparty through failure to timely redeliver the Vessel. *See* Ex. 5 ¶ 35. CHO again noted MOCC's failure to exercise its option to extend the charter period and asked MOCC to advise whether it intended to redeliver the Vessel. *See* Ex. 5 ¶ 35. MOCC again did not respond to CHO's correspondence. *See* Ex. 5 ¶ 35.

23.      Due to MOCC's failure to redeliver the Vessel or effectively exercise its option to extend the charter, enhanced hire rates began accruing no later than March 11, 2023.

24.      On or about April 5, 2023, with the charter period indisputably expired, CHO again wrote to MOCC, this time giving MOCC three banking days' notice to rectify its failure to timely pay hire due on March 31, 2023. *See* Ex. 5 ¶ 36. This notice finally elicited a response from MOCC. *See* Ex. 5 ¶ 36.

25.      On or about April 6, 2023, MOCC rebutted CHO's demand and alleged that CHO was responsible for any missing hire payments. *See* Ex. 5 ¶ 37. MOCC also threatened that CHO would be liable for MOCC's losses if it exercised its right to terminate the Charterparty. *See* Ex. 5 ¶ 37.

26.      CHO viewed MOCC's April 6 correspondence as evidence of MOCC's breach of the Charterparty. In its response on or about April 13, 2023, CHO notified MOCC that it

considered the Charterparty terminated due to MOCC's actions. *See* Ex. 5 ¶ 38. Although terminated by MOCC's conduct, CHO simultaneously exercised its right to terminate the Charterparty under Clauses 15(e) and/or 31(a). *See* Ex. 5 ¶ 38.

27.    CHO's April 13, 2023, notice of termination demanded $2,828,333.25 in past due hire, redelivery of the Vessel at Dos Bocas, Tabasco, and assistance with arranging the Vessel's necessary documentation. *See* Ex. 5 ¶ 38. MOCC did not respond immediately or comply with CHO's demand. *See* Ex. 5 ¶ 38. Either directly or through counsel, CHO wrote to MOCC demanding redelivery of the Vessel at least six times between April 18, 2023, and June 8, 2023, to no avail.

28.    Despite the clear termination of the Charterparty by CHO's April 13, 2023, correspondence and multiple demands for the Vessel's redelivery, MOCC has wrongfully failed and/or refused to redeliver the Vessel to CHO or remit the outstanding charter hire.

## PROCEDURAL BACKGROUND

### I.    The Singapore Arbitration

29.    CHO served a Notice of Arbitration on MOCC on September 13, 2022, seeking damages for unpaid Vessel hire.[3] *See* Ex. 4 at 3 ¶ 3. Pursuant to Rule 3.3 of the SIAC Rules, arbitration was formally commenced on September 23, 2022. *See* Ex. 4 at 11.

30.    MOCC filed a Notice of Rejection of Arbitration on or about September 26, 2022, rejecting the arbitration due to alleged fraud and misrepresentation by CHO. *See* Ex. 4 at 11. After the parties failed to agree on a sole arbitrator, CHO requested that the President of the Court of Arbitration of SIAC appoint a sole arbitrator pursuant to SIAC Rule 10.2. *See* Ex. 4 at

---

[3] The Notice of Arbitration did not include a claim for redelivery of the vessel as the initial charter period had not yet expired.

11. SIAC notified CHO and MOCC on December 7, 2022, that the SIAC President determined that the arbitration would be conducted in accordance with SIAC's Expedited Procedures before a sole arbitrator. *See* Ex. 4 at 11. On January 5, 2023, SIAC appointed Andrew G. Moran KC (the "Arbitrator") in compliance with SIAC Rule 9.3. *See* Ex. 4 at 11.

31.     After appointment of the Arbitrator on January 5, 2023, CHO served its Statement of Claim and Application for a Final Partial Award ("SOC") upon MOCC. *See* Ex. 4 at 11. Although designated as served on January 5 due to this being the date the Arbitrator was appointed, the SOC was dated and sent to MOCC on December 14, 2022. *See* Ex. 4 at 11. In the SOC, CHO sought past due charter hire amounting to $2,108,333.25 plus interest and costs. *See* Exhibit 6 at 8 ¶ 23, Statement of Claim.

32.     MOCC served its Statement of Defense and Counterclaim ("SOD") on February 13, 2023. *See* Ex. 4 at 17. The SOD included a counterclaim against CHO relating to Vessel hire and renewed MOCC's previously denied application to remove the arbitration from SIAC's Expedited Procedure. *See* Ex. 4 at 17.

33.     On February 23, 2023, the Arbitrator ordered that the arbitration would no longer proceed under SIAC's Expedited Procedure and set new arbitration deadlines. *See* Ex. 4 at 17.

34.     CHO then filed its Application for Final Partial Award in Respect of Unpaid Hire ("Application") on March 6, 2023. *See* Ex. 4 at 19. The arbitrator held a procedural hearing on CHO's Application on April 17, 2023. *See* Ex. 4 at 25.

35.     On April 20, 2023, MOCC requested via email that the Arbitrator refrain from making a decision on the Application due to pending litigation in Mexico regarding the Vessel and Charterparty. *See* Ex. 4 at 25-26. The Arbitrator advised the parties that a ruling would be issued as soon as possible unless and until a formal application was made by either party to stay

the proceedings. *See* Ex. 4 at 26-27. No formal application being properly made, the Arbitrator

issued his Procedural Order on April 22, 2023, setting the Application for a May 16, 2023 Oral,

Hearing. *See* Ex. 4 at 28-29.

36.     The arbitrator held an oral hearing on CHO's Application on May 16, 2023. *See*

Ex. 4 at 50.

37.     On May 19, 2023, CHO filed its Application for Urgent Mandatory Injunction

("Injunction Application"), seeking an order from the Arbitrator requiring MOCC to redeliver

the Vessel. *See* Ex. 5 at 8. On May 21, 2023, the Arbitrator directed MOCC to state its agreement

or disagreement to the procedural proposals included in the Injunction Application. *See* Ex. 5 at

8.

38.     Rather than assert its position on the Injunction Application's procedural

proposals, MOCC withdrew from the arbitration proceedings altogether on May 22, 2023. *See*

Ex. 5 at 8-9. In counsel's email announcing MOCC's withdrawal, counsel raised claims relating

to what MOCC perceived as unfair scheduling practices by the Arbitrator and informing the

Arbitrator that he had been "deinstructed." *See* Ex. 5 at 9. On May 24, 2023, counsel for MOCC

notified the Arbitrator and CHO that they did not wish to receive any further communication

from counsel regarding the arbitration and that the Arbitrator's emails were to be blocked

entirely. *See* Ex. 5 at 12.

39.     Despite MOCC's withdrawal, the Arbitrator continued to copy MOCC on

proceeding correspondence via emails to: rolando@mexiship.com (Rolando Ramon),

armando@mexiship.com, operaciones@mexiship.com, and c.colin@mexiship.com. *See* Ex. 5 at

13. In response to tribunal correspondence, the Arbitrator received more than ten emails

purporting to be undeliverable responses that "appeared to be manual rather than automatic"

from rolando@mexiship.com and armando@mexiship.com. *See* Ex. 5 at 13-16.

40.     By email dated May 28, 2023, the Arbitrator advised MOCC that it was contractually bound to the arbitration proceedings and that its failure to respond to correspondence or participate in the proceedings would not prevent the arbitration from moving forward. *See* Ex. 5 at 14. The Arbitrator also invited MOCC to reengage in the arbitration process at any time. *See* Ex. 5 at 14. The Arbitrator continued to copy MOCC's representatives on emails throughout the remainder of the proceeding.

41.     On June 5, 2023, the Arbitrator issued his Order on Claimant's Application for an Interim Mandatory Injunction to Re-Deliver the Vessel "M Luisa" (ex-Turquoise) to the Claimant (the "Interim Order"). The Interim Order awarded an interim injunction in CHO's favor against MOCC relating to MOCC's continued refusal to redeliver the Vessel. *See* Exhibit 7, Amended Order on Interim Injunction.[4] The Interim Order required redelivery of the vessel and MOCC's assistance removing it from the Mexican Bareboat Registry and reflagging it under the Singapore flag. *See* Ex. 7 at 2. CHO was required to deliver a copy of the Interim Order to MOCC in Mexico and provide proof of such delivery to the tribunal. *See* Ex. 7 at 2. The Interim Order also ordered CHO to amend its SOC, originally filed September 13, 2022, to include all grounds relied upon in its Injunction Application, i.e., to include in its statement of claim a request for injunctive relief and redelivery of the Vessel. *See* Ex. 7 at 2.

42.     In compliance with the Interim Order, CHO filed Amendment No. 1 to its Statement of Claim and Application for a Final Partial Award ("Amended SOC") on June 12, 2023. *See* Ex. 5 at 20; Exhibit 8, Amended Statement of Claim. The Amended SOC sought Final Partial Awards ordering MOCC to remit unpaid hire and redeliver the Vessel to CHO. *See* Ex. 8

---

[4] The arbitrator issued an Amended Order on the same day, correcting the address to which a copy of the Order was to be served.

§ J.

43.    Final Partial Awards on CHO's Application and Injunction Application as requested in the Amended SOC were issued on July 26, 2023. *See* Ex. 4; 5.

44.    In the Redelivery FPA, the Arbitrator found that the Charterparty ended due to the passage of time and that MOCC breached the Charterparty by failing to:

> (i)    Redeliver the Vessel into CHO's possession pursuant to Clauses 10 and 32 of the Charterparty;

> (ii)    Redeliver the Vessel in the same condition and class in which it was delivered pursuant to Clauses 10 and 13(g) of the Charterparty;

> (iii)    Arrange for the Vessel to be deleted from the Bareboat Registry pursuant to Part V, Clause 3 of the Charterparty; and

> (iv)    Take all necessary steps and render any necessary assistance to CHO for the Vessel to be re-registered and re-flagged with the Singapore flag, at MOCC's expense and time in accordance with Clause 13(f) of the Charterparty.

Ex. 5 ¶ 53.

45.    In light of those findings, the Redelivery FPA ordered as follows:

> (i)    That the Respondent by its directors and/or servants and/or agents and/or employees and/or otherwise howsoever shall deliver-up vacant possession of the Vessel to the Claimant or its duly authorized agents within five (5) calendar days from the date of this Award, by allowing the Claimant to take delivery of the Vessel at a readily accessible safe berth or mooring at Dos Bocas, Tobasco;

> (ii)    That the Respondent is hereby restrained from putting the Vessel out to sea and/or dealing and/or otherwise interfering with the Vessel and/or any equipment on board and/or belonging to the Vessel, save strictly for the purpose of repositioning the Vessel to comply with the delivery-up orders at (i) above;

> (iii)    That the Respondent shall forthwith and, in any event, within five (5) calendar days of the date of this Order arrange for the Vessel to be deleted from the Bareboat Registry in Mexico;

> (iv)    That the Respondent take all necessary steps and render any necessary assistance to the Claimant for the Vessel to be promptly

> re-registered and reflagged with the Singapore flag at the Respondent's expense and time; and

> (v)    That the Respondent shall pay the Claimant's reasonable legal costs of seeking a mandatory injunction for the redelivery of the Vessel in any event, to be assessed by the Tribunal if not agreed.

Ex. 5 § XII.

46.    In the Unpaid Hire FPA, the Arbitrator found that "the minimum sum of hire" payable should be awarded to CHO. Ex. 4 ¶ 168. After determining the minimum sum of hire payable, the Arbitrator ordered:

> (i)    That the Respondent shall forthwith pay to the Claimant **USD 1,668,856.75** being the total of the minimum sum of hire sue and payable to it under the BBC of USD 1,603,000.00, and interest at the rate of 5.33% per annum accruing on that minimum sum, from the due dates of payment of instalments of hire, amounting to USD 65,856.75, to the date of the Hearing, the 16th May 2023.

> (ii)    That the Respondent shall forthwith pay to the Claimant **USD 16,385.60** being further interest accruing at the rate of 5.33% per annum, on the minimum sum of hire due and payable to it under the BBC of USD 1,603,000.00, from the date of the Hearing, 16 May 2023, to the date hereof, being 70 days at the rate of USD 234.08 per day.

> (iii)    That the Respondent shall pay to the Claimant post award interest at the rate of 5.33% per annum on the amounts awarded in paragraphs (i) and (ii) of this dispositive section, being in total USD 1,685,242.35, accruing at the daily rate of **USD 246.09** from the date of this Award until payment of the amount awarded.

Ex. 4 § XI.

47.    As of the date of this Petition, MOCC has not complied with the FPAs.[5]

## II.    The Singapore Court Orders

48.    On July 10, 2023, CHO's Originating Application (Without Notice) was filed in

---

[5] To further demonstrate MOCC's willful nonparticipation in the arbitration, the Arbitrator issued a third Final Partial Award dismissing MOCC's Defense and Counterclaim due to MOCC's failure to comply with an "unless" order issued by the Arbitrator.

the General Division of the High Court of the Republic of Singapore. *See* Exhibit 9, Originating Application. By the Originating Application, CHO sought leave of the Singaporean Court to enforce the Interim Order against MOCC. *See Ex.* 9.

49.     The Singaporean Court held a hearing on July 19, 2023, regarding CHO's application for enforcement. *See* Exhibit 10, Order of Court. By Order dated July 20, 2023 (the "Order of Court"), the Singaporean Court granted CHO leave to enforce the Interim Order. *See* Ex. 10. The Order of Court stated, in part:

> 2. Upon the expiration of 14 days after this Order of Court is served on the Defendant, or within such period as this Honourable Court may fix, the Claimant (being also the Claimant named in the Order) be at liberty to enter an order against the Defendant (being the Respondent in the Order) in the terms of the Order as follows:

*See* Ex. 10. The Order of Court then restated each of the six items set out in the Interim Order. *See* Ex. 10.

50.     Service was made on MOCC in compliance with the Order of Court on September 20, 2023 at Ciudad del Carmen, Campeche, Mexico. *See* Exhibit 11 ¶ 5, Order Pursuant to Order of Court. Although advised by the Order of Court of its ability to move to set aside the Order of Court, MOCC did not seek such relief. *See* Ex. 11 ¶ 5. There being no objection to the Order of Court, the Singaporean Court ordered on October 31, 2023, that the terms set forth in the Interim Order be ordered against MOCC. *See* Ex. 11 at 2.

51.     As of the date of this Petition, MOCC has not complied with any Singapore Court Orders.

151518.06501/133625101v.5

## DISCUSSION

### I.    New York Convention Applicability

52.    Judicial recognition and confirmation of international arbitral awards is governed by the New York Convention, codified at 9 U.S.C. §§ 201-08. *See Schlumberger Tech. Corp. v. United States*, 195 F.3d 216, 217 (5th Cir. 1999). The goal of the New York Convention is "to encourage the recognition and enforcement of commercial arbitration agreements in international contracts and to unify the standards by which agreements to arbitrate are observed and arbitral awards are enforced in the signatory countries." *Imperial Ethiopian Gov't v. Baruch-Foster Corp.*, 535 F.2d 334, 335 (5th Cir. 1976) (quoting *Scherk v. Alberto-Culver Co.*, 417 U.S. 506, (1974)). Actions or proceedings falling under the New York Convention include "arbitration agreement[s] or arbitral award[s] arising out of a legal relationship, whether contractual or not, which is considered as commercial." 9 U.S.C. § 202.

53.    CHO and MOCC are entities organized under the laws of Singapore and Mexico, respectively, and have their principal places of business in their countries of organization. The arbitration between CHO and MOCC took place in Singapore, as directed by the Charterparty in issue. A legal, commercial relationship exists between CHO and MOCC and a Singapore arbitrator has entered an international arbitral award in a dispute between these signatory-country entities. As such, the New York Convention governs this Petition.

### II.    New York Convention Standard of Review

54.    Mirroring the expeditious nature of arbitration, the New York Convention provides a "summary procedure" for enforcing foreign arbitral awards. *Imperial Ethiopian Gov't*, 535 F.2d at 335. As such, an enforcing court "shall confirm the award unless it finds one of the grounds for refusal or deferral of recognition or enforcement of the award specific in the

said Convention." 9 U.S.C. § 207. Convention defenses "are narrowly construed to give effect

to the Convention's goal of encouraging the timely and efficient enforcement of awards."

*Karaha Bodas Company LLC v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 190

F.Supp.2d 936, 943 (S.D. Tex. 2001). "In short, there is a 'general pro-enforcement bias'

manifested in the Convention." *Karaha Bodas Company*, 190 F.Supp.2d at 943 (quoting

*American Const. Mach. & Equip. Corp. v. Mechanised Const. of Pakistan, Ltd.*, 659 F.Supp.

426, 428 (S.D.N.Y. 1987)).

    55.    Article V of the New York Convention—as implemented by 9 U.S.C. § 207—

sets out the only grounds on which a court may refuse to confirm an award:

> 1.  Recognition and enforcement of the award may be refused, at the request of the party against whom it is invoked, only if that party furnishes to the competent authority where the recognition and enforcement is sought, proof that:
>
> > (a) The parties to the agreement referred to in article II were, under the law applicable to them, under some incapacity, or the said agreement is not valid under the law to which the parties have subjected it or, failing any indication thereon, under the law of the country where the award was made; or
> >
> > (b) The party against whom the award is invoked was not given proper notice of the appointment of the arbitrator or of the arbitration proceedings or was otherwise unable to present his case; or
> >
> > (c) The award deals with a difference not contemplated by or not falling within the terms of the submission to arbitration, or it contains decisions on matters beyond the scope of the submission to arbitration, provided that, if the decisions on matters submitted to arbitration can be separated from those not so submitted, that part of the award which contains decisions on matters submitted to arbitration may be recognized and enforced; or
> >
> > (d) The composition of the arbitral authority or the arbitral procedure was not in accordance with the agreement of the parties, or, failing such agreement, was not in

accordance with the law of the country where the arbitration took place; or

(e) The award has not yet become binding on the parties, or has been set aside or suspended by a competent authority of the country in which, or under the law of which, the award was made.

2. Recognition and enforcement of an arbitral award may also be refused if the competent authority in the country where recognition and enforcement is sought finds that:

(a) The subject matter of the difference is not capable of settlement by arbitration under the law of that country; or

(b) The recognition or enforcement of the award would be contrary to the public policy of that country.

Convention art. V.

56. An enforcing court's role is limited to evaluating New York Convention Defenses. The court will not reconsider the arbitrator's findings. *Karaha Bodas Company*, 190 F.Supp.2d at 943 (quoting *Europcar Italia v. Maiellano Tours*, 156 F.3d 310, 315 (2d Cir. 1998)) ("[A]bsent extraordinary circumstances, a confirming court is not to reconsider the arbitrator's findings."). An arbitrator's "mistake in fact or law is insufficient to refuse confirmation of an arbitral award." *Id.* The party seeking to avoid enforcement of the arbitral award bears the burden of proof in confirmation proceedings. *Id.* (citing *Imperial Ethiopian Gov't*, 535 F.2d at 336).

## III.    Absence of Exceptions to Award Enforcement

57. None of the grounds to refuse confirmation exist in this case. The Court should therefore recognize, confirm, and enforce the FPAs.

### i.    *Incapacity and Contractual Validity*

58. Neither party lacked capacity and the Charterparty and arbitration clause are valid. MOCC participated in the underlying arbitration, consented to the governance of the law

of England and Wales, asserted affirmative claims for relief, suggested an arbitrator, and participated in hearings before the Arbitrator. *See e.g.,* Ex. 4 § V.

59.    In addition to the parties' clear consent to the arbitration, the Arbitrator and Singaporean Court also addressed the validity and enforceability of the arbitration agreement. In the FPAs, the Arbitrator found that the Charterparty was "validly formed and binding under the law of England and Wales, which the Parties have agreed governs both agreements." Ex. 5 at 3 ¶ 4; Ex. 4 at 3 ¶ 2. The Singaporean Court also found the arbitration valid, implicitly finding the underlying agreement to arbitrate valid. *See* Ex. 10; 11.

60.    Given the parties' consent, the Arbitrator's findings, and the Singaporean Court's confirmation of the Interim Order, it is clear that no party was under incapacity when entering into the arbitration agreement and that the agreement is valid under controlling law.

ii.    *Notice and Ability to Present Case*

61.    MOCC had ample notice of the proceedings and the opportunity to present its case. CHO provided notice to MOCC through the Notice of Arbitration dated September 13, 2022. Roughly two weeks later, MOCC filed its Notice of Rejection of Arbitration. There is therefore no colorable argument that CHO failed to provide notice of the arbitration. Further, despite voluntarily withdrawing from the arbitration, MOCC was always afforded an opportunity to present its case by rejoining the proceedings. Even after withdrawing, MOCC was kept informed throughout the pendency of the arbitration and repeatedly notified of its right to rejoin the proceedings. *See* Ex. 5 at 3 ¶ 4; Ex. 4 at 3 ¶ 2.

iii.    *Scope of the Arbitration*

62.    The FPAs are within the scope of the arbitration claim and the Charterparty. The Charterparty provides that "any dispute arising out of or in connection with this Charter Party

shall be referred to arbitration[.]" Ex. 2 Cl. 33. It is beyond dispute that the matters raised in the SOC and Amended SOC arise directly out of and/or relate to the parties' obligations under the Charterparty. Specifically, the SOC and Amended SOC sought awards for unpaid hire and issuance of an injunction requiring MOCC to redeliver the Vessel. MOCC was obligated under the Charterparty to pay hire and redeliver the Vessel. The FPAs are confined to discrete matters governed by the Charterparty and do not deal with matters beyond the scope of submission to arbitration.

      iv.    *Tribunal Composition*

     63.    The composition of the arbitral authority accorded with the parties' agreement. The Charterparty provided for an arbitration applying English law administered "in Singapore via SIAC Rules." Ex. 2 Box 26. The Charterparty further called for the appointment of a sole arbitrator and for proceedings to be held in English. Ex. 2 Box 26.

     64.    After the parties were unable to propose an agreed sole arbitrator, the SIAC President appointed Andrew G. Moran KC as sole arbitrator in compliance with SIAC Rule 9.3. The Arbitrator then conducted the proceedings under the SIAC rules as provided under the Charterparty.

      v.    *Binding Award*

     65.    The FPAs are binding on MOCC and unappealable under Singapore law. Further, they have not been set aside or suspended by any court. MOCC consented to arbitration in the Charterparty and by its participation in the arbitration proceedings, subjecting itself to the arbitration award. MOCC was served with the FPAs and given an opportunity to object to same. It declined to do so. The FPAs have not been set aside or suspended by any court, nor has MOCC asked any court to do so.

151518.06501/133625101v.5

vi.    *Arbitrability*

66.    There is no question that the parties' dispute involving commercial obligations under the Charterparty is capable of settlement by arbitration under United States law. U.S. law strongly encourages arbitration of international commercial disputes and the recognition of resulting awards. *See, e.g., Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 615 (1985) (noting strong "federal policy in favor of arbitral dispute resolution, a policy that applies with special force in the field of international commerce"). Agreements such as the arbitration clause freely entered into between international private parties are presumed valid. *Sembawang Shipyard Ltd. v. Charger Inc.*, 955 F.2d 983, 986 (5th Cir. 1992) (*citing Carnival Cruise Lines v. Shute*, 499 U.S. 585 (1991)).

vii.    *Public Policy*

67.    As stated above, the United States has a strong public policy in favor of international arbitration. *See Mitsubishi Motors Corp.*, 473 U.S. at 615. Further, the United States and Singapore are each a signatory to the New York Convention, and each has implemented the Convention through domestic legislation. *See e.g.,* 9 U.S.C. §§ 201-08; International Arbitration Act 1994. The implementation of the New York Convention clearly indicates that U.S. public policy supports enforcement of international arbitral awards. There is no indication that arbitration governing an enforceable maritime contract is against public policy. Accordingly, recognition and enforcement of the FPAs is not contrary to public policy.

**IV.    Enforcement and Confirmation of Singapore Court Orders**

68.    CHO also seeks enforcement and confirmations of the Singapore Court Orders of July 20, September 20, and October 31, 2023, on principles of comity.  See *Banque Libanaise Pour Le Com. v. Khreich*, 915 F.2d 1000, 1004 (5th Cir. 1990) (citing *Hilton v. Guyot,* 159 U.S.

113, 163–64, 16 S.Ct. 139, 143, 40 L.Ed. 95 (1895) ("Historically foreign country judgments have not been entitled to full faith and credit, but only to comity.").  "Under principles of international comity, a foreign court's judgment on a matter is conclusive in a federal court when (1) the foreign judgment was rendered by a court of competent jurisdiction, which had jurisdiction over the cause and the parties, (2) the judgment is supported by due allegations and proof, (3) the relevant parties had an opportunity to be heard, (4) the foreign court follows procedural rules, and (5) the foreign proceedings are stated in a clear and formal record." *Int'l Transactions, Ltd. v. Embotelladora Agral Regiomontana*, 347 F.3d 589, 594 (5th Cir. 2003) (citing *Hilton*, 159 U.S. at 159).  *Dantzler, Inc. v. Intermarine LLC*, No. CV 20-931, 2020 WL 5545646, at *4 (E.D. La. Sept. 16, 2020).  Each of the foregoing criteria applies in this case.

69.    As the arbitration took place in Singapore and CHO is a company formed under the laws of the Republic of Singapore, the Singapore High Court was a court of competent jurisdiction to render the order confirming the Interim Order and enjoining MOCC to redeliver the Vessel. The Singapore Court Orders of July 20, September 20, and October 31, 2023 were also supported by sufficient allegations and proof, the court being provided with the relevant Interim Award and factual background. The Singapore Court also followed its required procedural guidelines, including requiring service of the Order of Court on MOCC and proof of same prior to issuing its final order.

70.    MOCC had an opportunity to be heard and elected not to appear in the Singapore Court proceedings. MOCC was served with the Order of Court as required by the Singapore Court and given adequate time to respond and assert its position. It elected not to.

71.    Finally, as detailed above, the Singapore Court proceedings were clearly and formally stated. Record was kept and service of relevant court documents was provided to MOCC

as required by the court. Because each required element of comity is satisfied, CHO asks the Court to recognize the Singapore Court's order enjoining MOCC and directing return of the Vessel to CHO.

## **CONCLUSION**

72.     The Arbitrator, having considered all properly presented evidence and argument, issued two detailed Final Partial Awards setting forth the relevant facts and procedural history, and the law relied on to justify the awards. In the Final Partial Award on Mandatory Injunction, the Arbitrator found that the Charterparty ended due to passage of time and that MOCC "serially breached its various clauses referred to, by failing and/or refusing" to:

(i)     Redeliver the Vessel into CHO's possession pursuant to Clauses 10 and 32 of the Charterparty;

(ii)    Redeliver the Vessel in the same condition and class in which it was delivered pursuant to Clauses 10 and 13(g) of the Charterparty;

(iii)   Arrange for the Vessel to be deleted from the Bareboat Registry pursuant to Part V, Clause 3 of the Charterparty; and

(iv)    Take all necessary steps and render any necessary assistance to CHO for the Vessel to be re-registered and re-flagged with the Singapore flag, at MOCC's expense and time in accordance with Clause 13(f) of the Charterparty.

Ex. 5 ¶ 53. In the Unpaid Hire FPA, the Arbitrator found that "the minimum sum of hire" payable should be awarded to CHO. Ex. 4 ¶ 168.

73.     The grounds for a court to refuse to confirm the Final Partial Awards under the New York Convention are extremely narrow and the burden of proof on the party seeking to avoid confirmation of a foreign arbitration award is extremely high. None of the grounds to refuse recognition and enforcement exist here. Accordingly, the Court should recognize, confirm, and enforce the Final Partial Awards.

151518.06501/133625101v.5

## REQUESTED RELIEF

WHEREFORE, Petitioner moves this Court for an Order:

A. Recognizing, confirming, and enforcing the Final Partial Awards and Singapore Orders of June 20 and October 31, 2023, rendered in CH Offshore Ltd.'s favor against Mexiship Ocean CCC S.A. de C.V. pursuant to the New York Convention and 9 U.S.C. §§ 201-08;

B. Directing that judgment be entered in CH Offshore Ltd.'s favor against Mexiship Ocean CCC S.A. de C.V. for unpaid hire in the amounts of **$1,685,242.35** for damages through the date of the Final Partial Awards and **$246.09** per day in damages accruing from issuance of the Final Partial Awards until the amount is paid;

C. Directing that judgment be entered against Mexiship Ocean CCC S.A. de C.V. ordering that:

   a. MOCC, by its directors and/or servants and/or agents and/or employees and/or otherwise howsoever shall immediately deliver-up vacant possession of the Vessel to CHO or its duly authorized agents by allowing CHO to take delivery of the Vessel at a readily accessible safe berth or mooring at Dos Bocas, Tobasco, Mexico;

   b. MOCC be restrained from putting the Vessel out to sea and/or dealing and/or otherwise interfering with the Vessel and/or any equipment on board and/or belonging to the Vessel, save strictly for the purpose of repositioning the Vessel to comply with the delivery-up orders at (a) above;

   c. MOCC shall forthwith arrange for the Vessel to be deleted from the Bareboat Registry in Mexico;

   d. MOCC shall take all necessary steps and render any necessary assistance to CHO for the Vessel to be promptly re-registered and re-flagged with the Singapore flag, at MOCC's expense and time; and

   e. MOCC shall pay CHO's reasonable legal costs of seeking a mandatory injunction for the redelivery of the Vessel in any event.

D. Retaining jurisdiction to enforce satisfaction of the judgment as may be necessary;

E. Authorizing discovery in aid of execution of this Court's judgment; and

151518.06501/133625101v.5

F.  For all such other and further relief to which CH Offshore Ltd. is entitled.

Dated: December 6, 2023                Respectfully submitted,
       Houston, Texas

                                       **BLANK ROME LLP**


                                       */s/ Keith B. Letourneau*
                                       Keith B. Letourneau, *Attorney-in-Charge*
                                       State Bar No. 00795893
                                       717 Texas Avenue, Suite 1400
                                       Houston, Texas 77002
                                       (713) 402-7650 Telephone
                                       (713) 228-6605 Facsimile
                                       Email: kletourneau@blankrome.com
                                       Email: evan.spencer@blankrome.com

                                       ***Attorneys for Petitioners CH Offshore Ltd.***



Of Counsel:

**BLANK ROME LLP**

G. Evan Spencer
State Bar No. 24113493

24